

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| DENNIS EDWARD RAYNER, EVEN BETTER LOGISTICS, LLC, and MICHELLE CORA CROOM, | § § | No. 08-20-00145-CV |
| Appellants, | § | Appeal from the |
| | § | 353rd District Court |
| v. | § | of Travis County, Texas |
| RONNIE CLAXTON and SANDRA CLAXTON, | § | (TC# D-1-GN-19-000281) |
| Appellees. | § | |

**O P I N I O N**

Appellants, Dennis Edward Rayner, Even Better Logistics, LLC (EBL), and Michelle Cora Croom, appeal the trial court's judgment against them for personal injury and exemplary damages arising out of an accident involving a truck carrying an over-height load, colliding with a highway overpass, injuring Appellee, Ronnie Claxton, who was traveling behind the truck on the roadway. Claxton and his wife, Appellee Sandra Claxton, sued for personal injury damages under various theories of direct negligence and vicarious liability against Rayner, the driver of the truck carrying the over-height load; EBL, Rayner's employer and the owner of the truck; and Croom, a fifty percent owner and member-manager of EBL. Following a trial, the jury found Rayner, Croom, and EBL each partially responsible for causing the accident and awarded economic damages to

Appellees, as well as exemplary damages against each Appellant for gross negligence.

Appellants filed a motion for judgment notwithstanding the verdict and motion for new trial, alleging legal and factual insufficiency of the evidence to support the jury's findings of liability against each defendant, to include the findings of gross negligence. Appellants also argued the damages amounts were unsupported by the evidence, and the evidence was unconstitutional.

We reverse and render judgment in favor of Croom on all theories of liability alleged against her and reverse and render in favor of EBL on Appellees' claims for negligent entrustment; negligent maintenance; and negligent hiring, training, and supervising. We likewise reverse and render in favor of Rayner on Appellees' gross negligence claim. We also reverse and remand for new trial on Appellees' claims against Rayner and their claim for respondeat superior against EBL based on inadequate jury instruction and improper submission of jury questions on liability and in the interest of justice.

## FACTUAL BACKGROUND

### *Accident Facts*

On April 5, 2017, Rayner, a truck driver for EBL, was hauling an oversized load of oilfield spools from Dayton to Midland. The Texas Department of Transportation (TxDOT) requires oversized loads to obtain a special permit, which contains a specific route the driver must take. As Rayner approached Austin heading west on U.S. 290, he mistakenly took the exit going east on U.S. 183 instead of west as the TxDOT directions required. He drove several miles in the wrong direction on U.S. 183 before he realized his mistake. Once he realized his error, Rayner was required to pull to the shoulder of the road, exit the roadway, or turn around. However, according to Rayner, construction in the area eliminated the shoulder from the roadway and he was unable to pull over. The construction also prevented him from turning around, per his recollection. As he

2

continued eastbound on U.S. 183, part of the oversized load struck the underside of an overpass for State Highway 71. Rayner did not notice the bridge or the height sign on the bridge until it was "too late." Rayner stepped on the brakes, which engaged, but he was unable to avoid the load hitting the overpass. A part of the load came off the trailer and struck the windshield of Appellee Ronnie Claxton's passenger truck, who was driving behind Rayner's truck.

### *Procedural History*

Appellees filed their original petition against Appellants on January 15, 2019, seeking damages for personal injury. They later filed an amended petition, which was Appellees' live pleading at the time of trial. In their amended petition, Appellees asserted the following claims:

- Respondeat superior against EBL and Croom, alleging EBL and Croom were responsible for all acts or omissions of their agents;

- Negligence against all three Appellants for various failures in the use of ordinary care in operating a vehicle;

- Negligence per se against all three Appellants for violations of Texas state law in failing to adhere to restrictions related to overweight and over-height loads;

- Negligent entrustment against EBL for entrusting its vehicle to Rayner despite his alleged incompetence to operate the vehicle safely;

- Single business enterprise/joint venture against all three Appellants, claiming the three "integrated their resources to achieve a common business purpose," out of which arose the accident which is the subject of the suit;

- Gross negligence against all three Appellants, alleging their "operat[ion] [of] a motor-vehicle with reckless disregard of the rights of others . . . was a proximate cause of the damages suffered by [Appellees]."

Appellees sought personal injury damages for past and future physical pain, past and future emotional suffering and mental anguish, past and future disfigurement, future medical expenses, past lost wages, future loss of earning capacity, past and future physical impairment, past and future loss of enjoyment of life, loss of consortium, and loss of household services. Appellees also pleaded for exemplary damages against Rayner and Croom, individually, and EBL. Against

3

Rayner, Appellees alleged his failure to exercise due care in avoiding a collision with the bridge involved an extreme degree of risk to Claxton and others, and his driving at the time "demonstrate[d] a conscious indifference to the rights, welfare, and safety of others." Against Croom and EBL, Appellees alleged their failure to exercise due care in hiring drivers and training or supervising employees involved an extreme degree of risk. They claim this extreme risk proximately caused the damages suffered by the Appellees.

### *Trial on the Merits*

The case proceeded to trial on the merits beginning on January 13, 2020. The parties collectively obtained the testimony of nineteen witnesses; of those, only a few are pertinent to the issues we reach on appeal. We include a very brief summary of the pertinent testimony here, with more detailed accounts in our following discussion of the issues.

Timothy Case

Timothy Case, an officer with the Austin Police Department, served as an officer with the Commercial Vehicle Enforcement division, and prepared the crash report for the incident involving the parties in this case. According to his notes, Mr. Rayner deviated from the TxDOT-permitted route, and while off route, his oversized load struck a bridge. In his report, Officer Case indicated the oversized load was the only contributing factor in the collision. The chains securing the load broke off and went through the windshield of Mr. Claxton's pickup truck and struck another vehicle as well. He testified alternate routes existed where Mr. Rayner could have exited or turned around after he began going the wrong direction. Protocol for the driver of an oversize load who discovers he is off route is to stop in "a safe spot" and call TxDOT for a reroute. Officer Case testified he did not have any information Mr. Rayner knew he was off course until he hit the bridge. He testified the height of the bridge is marked on the bridge.

4

### Nathan Flippin

Nathan Flippin is an officer with the Austin Police Department and serves in the Commercial Vehicle Enforcement Unit. He participated in the inspection of the EBL truck following its collision with the overpass. In his inspection, he found twenty violations, seven of which should have put the EBL vehicle out of service. Among the violations, the vehicle's two brakes were out of adjustment, and one was defective.

Officer Flippin opined the vehicle should not have been on the roadway prior to the accident occurring and the issues should have been discovered in a pre-trip inspection; however, he was not sure if the brake's defects specifically would be a required item to check in a pre-trip inspection. In his opinion, the defective brake would likely not have worked during the incident. He testified despite the other noted violations, EBL was only cited for being over-height.

### Michelle Croom

Croom is the corporate representative, a managing member, and fifty percent owner of EBL. Prior to Rayner's collision with the bridge, EBL drivers had never been involved in a collision. Croom personally owned the trailer involved in the crash.

Croom testified Rayner was an employee of EBL, who was hired as a driver. When she hired Rayner, Croom pulled a copy of his driving record and reviewed it, noting he did not have any prior infractions according to his driving history. She does not recall how long Rayner held a commercial driver's license (CDL) before working for EBL but was aware "it was very long." She did not know whether his license had ever been suspended or revoked based on his driving record, which does not contain that information.

EBL did not have a company-specific safety manual. However, a copy of the Federal Motor Carrier Safety Administration (FMCSA) manual was kept in the break room of EBL's office. EBL

5

did not have a fleet safety program or written driver standards. EBL relied on verbal discussions with its employees regarding safety issues.

EBL dispatched its trucks through personal cell phones. The company did not have a policy related to drivers using cell phones in their trucks. She was aware Rayner used a flip phone and might have to do more than one touch to answer his phone. She acknowledged answering a phone using more than one touch causes a driver to be distracted from the roadway, thus putting the public at risk. She testified Rayner had a headset and Bluetooth capability in the truck. However, she was not sure whether he was using either during the time leading up to the incident.

Byron Scott was the safety coordinator for EBL. Scott is Croom's husband. She did not know what background Scott had in truck safety training when she hired him and later testified he did not have any truck safety background training prior to his employment with EBL. Scott was the only person at EBL who performed driving tests on new drivers. Other than an initial driving test, EBL did not provide other training to their drivers, including safety training, rules-of-the-road training, or defensive driving.

For Rayner to transport the oversized load, he was required to carry an oversized-load permit from TxDOT. The oversized-load permit is valid only on the TxDOT-approved route. The requirement for a permit is to ensure the vehicle carrying the load fits under all the bridges along the route of travel. Drivers are not permitted to deviate from the TxDOT-approved route. Ms. Croom agreed if Rayner stayed on course, the crash would not have occurred. She also agreed Rayner is supposed to be aware of federal regulations for motor carriers. She agreed drivers of oversized loads are supposed to pull over or turn around if they find themselves off route, and if Rayner had done so, the incident would have been prevented. Rayner did not contact EBL after he discovered he was off course but before the collision with the bridge. Croom agreed as a

6

professional driver, he should know if he travels off the assigned route. She agreed even if he did not know until he hit the bridge he was off the assigned route, "[he was] still in the wrong for having missed [the route] so badly[.]" She agreed Rayner's driving off the assigned route was "way below the standard [she] would expect from [EBL's] truck drivers" and was "reckless[.]"

She confirmed the truck Rayner drove should not have been on the road based on the issues with the tires and brakes. One of the other violations on the truck was improper brake lights. Three violations involved the brakes on the truck. The inspection sticker on the vehicle was also expired. Croom testified EBL allowing Rayner's vehicle on the roadway with an expired inspection sticker was dangerous and reckless.

She testified she took responsibility "as a person [and as owner of] my company" for the crash. In her deposition, she placed sole blame on Rayner for getting off the assigned route. However, at trial she testified she and EBL were also to blame but did not elaborate further. She confirmed Rayner was in the course and scope of his employment with EBL during the incident. She also agreed Rayner going off the assigned route was the sole cause of the incident.

### Byron Scott

Scott did not have a formal title of "safety coordinator" with EBL; he did what Croom asked of him. Scott agreed formal safety training of employees was not "in [his] lane" as an EBL employee. He testified he was responsible for safety issues involving EBL vehicle mechanics in addition to "ensuring that the person assigned to the piece of equipment knows how to operate it." He was not aware of any written policies or procedures at EBL regarding the use of CBs or cell phones.

Scott was trained on safe eighteen-wheeler operation in the Army. He has approximately twenty years of truck maintenance and repair experience. Scott testified he had hours of operation

training and extensive maintenance training on the inside and outside of trucks, as well as inspection training. He obtained a CDL at the end of his training. He also received maintenance training. He was also trained in inspections, which includes how to perform pre-trip inspections.

There is a pre-trip inspection checklist provided by the FMCSA included on the back of the driving logs. Scott stated a driver would just check a box indicating a pre-trip inspection was done; however, Scott performed more thorough inspections. He testified if he interviewed a driver who did not appear to know how to perform a pre-trip inspection, his recommendation to Croom would be not to hire that candidate. He confirmed he never trained an EBL driver to perform a pre-trip inspection.

If an EBL vehicle experienced maintenance issues, Scott's responsibility was to address them. Scott did not provide training to EBL drivers on how to drive safely. Scott testified he had "in-the-yard" sessions with drivers demonstrating they could operate the specific piece of assigned equipment. He provided training on how to drive and operate the piece of machinery, but not on the rules of the road, TxDOT regulations, or FMCSA regulations. He is not aware of company policies regarding safety.

Scott stated if something was wrong with an EBL truck on the road, it was not necessarily his responsibility. He said if something goes out of service on a vehicle as it is en route on the road, it is acceptable under certain circumstances to continue to drive that truck regardless of the out-of-service maintenance violations. He stated it is not appropriate to begin driving a vehicle with known mechanical issues. Part of the pre-trip inspection is ensuring any existing issues on the vehicle are discovered.

EBL drivers use a "DVIR," which lists parts of the vehicle to be inspected. Scott testified it was his responsibility to ensure EBL drivers adhered to requirements under the FMCSA

8

pertaining to vehicle maintenance and operation. Scott agreed the deficiencies noted by Officer Flippen on the EBL vehicle put travelers on the roadway at risk. Scott testified each tractor-trailer had twelve sets of brakes, or twenty-four brake pads total. If a brake is out of adjustment, it will still work. Scott agreed if Rayner followed the TxDOT route on the permit, the crash could have been avoided.

### Ronnie Claxton

On the afternoon of the accident, Claxton left work and was exiting Highway 71 to U.S. 183 south. He waited for Rayner's vehicle to pass and then turned onto U.S. 183 behind the EBL truck. Almost immediately after turning onto U.S. 183 behind Rayner, the EBL vehicle hit the bridge. Claxton did not see any indication Rayner attempted to brake before hitting the bridge and did not see any brake lights flash on. After the truck hit the bridge, Claxton recalls the EBL truck started slowing down and ultimately came to a stop after passing under the second overpass bridge. When the EBL truck hit the bridge, Claxton jerked his steering wheel because he believed the bridge was falling. His windshield shattered and debris came into his truck through the windshield. He saw a ratchet binder sitting in his front seat, which he believes entered through his windshield and caused it to break.

### Dennis Edward Rayner

Rayner has been a truck driver for forty-five years. He has not had any other job other than being a truck driver. Some trucking companies he worked for gave him a road test prior to employment. He occasionally also had to take written tests regarding operation of the vehicles and rules of the road. He is familiar with the rules of the road.

When EBL hired Rayner, he did not take any written tests prior to employment. Rayner testified he does not require corrective lenses and there are no restrictions on his commercial

driver's license or his medical card related to his vision. At the time of the incident, Rayner was required per a medical exam and safety board examination to wear corrective lenses.

At the time of the crash, Rayner was driving as an employee of EBL. The truck he drove was not equipped with GPS, but he purchased and used his own GPS system in the truck. It gave audible directions, and it was on at the time of the incident. His only means of communication with EBL while on a job was his personal cell phone with which he used a headset.

By federal law, he is required to perform a pre-trip inspection, or DVIR. The pre-trip inspection includes walking around the truck and trailer and inspecting them, including checking the tires and tread, the regular brakes and air brakes, the turn signals, the brake lights, air hoses, fluids, and the body of the vehicle. He is also required to check the load is secure, including the straps and chains. There are no exceptions to the federal requirement that issues discovered in a pre-trip inspection must be repaired before the truck can be driven. Rayner testified he performed a full and complete pre-trip inspection before leaving with the load in Dayton. He did not find any deficiencies in that inspection. He was unsure why EBL had not provided a copy of his pre-trip inspection DVIR list in response to discovery requests.

TxDOT determines which route a driver must take for an over-height load. Rayner used TxDOT's directions on this drive; his wife assisted him by phone, reading the TxDOT directions from a copy she had. Rayner also had his GPS device on, but it did not give TxDOT-specific directions. As he approached Highway 183, he understood his wife told him to go east on 183. She subsequently informed him he was going the wrong way if he was travelling east on Highway 183.

After realizing he was on the wrong route, Rayner did not recall any exits along the way where he could have turned the vehicle around. Once he realized he was going the wrong way, he called his wife to ascertain what route to take. As he approached the bridge, he did not see any

warning sign ahead of the bridge regarding height, nor any height sign on the bridge. He testified his line of sight of the bridge was obstructed due to a curve in the road just before he crashed into it. However, when shown a diagram of the area before the bridge, no curve in the road was pictured. He testified because he had just come around the curve, he did not see the bridge sign on the bridge until he was "right up on it and it was too late[,]" which is why he collided with the bridge.

He understood he caused the crash by going off the assigned route; however, he believes the accident could have been avoided if bridge signage had been better. Traffic conditions at the time of the accident were busy. Before Rayner's truck hit the bridge, he "stepped on the brake[,]" which engaged. He did not believe he downshifted the truck to slow his speed. After he had already gone under both bridges of Highway 71, he brought the truck to a stop on the shoulder of the road. Claxton also stopped his vehicle after going under both bridges.

Rayner testified he was not using his phone during the incident. He estimated he was traveling approximately twenty miles per hour when he hit the bridge; he stated he was driving slowly because he was looking to turn around. It was an accident that caused him to take the wrong turn onto 183; in addition, he was not sure where he was or where he was going.

### The Verdict

After deliberating, the jury returned a verdict in favor of Appellees. They answered "yes" to the question of whether the negligence of each of Appellant proximately caused the incident. The jury apportioned Appellant's responsibility as follows: fifteen percent to Rayner, seventy percent to EBL, and fifteen percent to Croom. For damages to Mr. Claxton, the jury awarded $121,676 in loss of earning capacity in the past, $90,083 for loss of earning capacity in the future, and $1,049,555 for future medical expenses. For each remaining category of damages, including past and future physical pain, mental anguish, disfigurement, and physical impairment, the jury

11

did not award any damages. For Mrs. Claxton, the jury awarded $35,000 for loss of household services in the future. The jury did not award Mrs. Claxton any other damages.

The jury answered affirmatively on the gross negligence questions for Rayner, EBL, and Croom. It awarded $100,000 in exemplary damages to Mr. Claxton from Rayner, $5,000,000 in exemplary damages to Mr. Claxton from EBL, and $1,000,000 in exemplary damages to Mr. Claxton from Croom.

**Post-Trial Motions**

On February 11, 2020, Appellees filed a form for proposed judgment based on the verdict rendered by the jury. On March 2, 2020, Appellants filed a response opposing the proposed judgment to "inform the Court of critical errors in the proposed judgment before any judgment against [Appellants] is rendered." On March 13, 2020, the trial court entered judgment against Appellants based on the jury's findings and awards as follows:

- The trial court found and apportioned responsibility per the jury's findings, assigning fifteen percent responsibility each to Rayner and Croom, and seventy percent to EBL;

- The trial court ordered Appellees to recover from Rayner $194,447.10 in compensatory damages, representing his percent of responsibility, and $100,000 in exemplary damages;

- The trial court ordered Appellees to recover from EBL $1,296,314, finding EBL jointly and severally liable for the full amount of the judgment since EBL was determined to be more than fifty percent responsible for the occurrence, and $2,592,628.00 in exemplary damages after statutory caps on exemplary damages were applied. *See* TEX.CIV.PRAC.& REM.CODE ANN. § 41.008;

- The trial court ordered Appellees to recover from Croom $194,447.10 in compensatory damages, representing her percent of responsibility, and $1,000,000 in exemplary damages; and

- The trial court ordered Appellees to recover from each Appellant their proportionate amount of prejudgment interest owed, and costs of court jointly and severally.

On April 9, 2020, Appellants timely filed a motion to disregard and for judgment notwithstanding the verdict (JNOV)(hereafter, motion for JNOV). *See Commonwealth Lloyd's Ins.*

12

*v. Thomas*, 825 S.W.2d 135, 141 (Tex.App.—Dallas 1992), *writ granted w.r.m.*, 843 S.W.2d 486 (Tex. 1993).[1] The same day, Appellants also filed a motion for new trial.

In the motion for JNOV, Appellants claim the jury's finding that Rayner proximately caused the occurrence "is immaterial and supported by legally insufficient evidence" and should be disregarded. Their contention is based on their position, among other things, Rayner did not breach a duty owed to Appellees, legally insufficient evidence exists showing Rayner failed to exercise ordinary care, and there is legally insufficient evidence showing any alleged breach by Rayner was a proximate cause of the accident. Appellants make the same assertions regarding EBL and Croom, arguing the jury's responses to Question 1 should be set aside. Additionally, regarding Croom, Appellants argue she owed Appellees no duty as a matter of law, and Appellees failed to plead or prove any viable theory of liability against Croom, in her individual capacity. Appellees also argued the jury's answers to Question 2 should be "rendered immaterial" because of the insufficient evidence supporting their answers to Question 1. Appellants argue the jury's responses to Question 4 regarding damages are immaterial and should be disregarded because they are not supported by legally sufficient evidence. Finally, Appellants argue the jury's responses to Questions 5, 6, 7, 8, 9, and 10, regarding gross negligence of the Appellants and the amount of exemplary damages awarded, are immaterial and should be disregarded. They allege the evidence is legally insufficient to support a finding of gross negligence or the amount of exemplary damages

---

[1] We recognize a split in authority on when a motion for JNOV is considered timely. *See, e.g.*, *Thomas*, 825 S.W.2d at 141 (stating motion for JNOV must be filed within thirty days after signing of judgment); *BCY Water Supply Corp. v. Residential Inv., Inc.*, 170 S.W.3d 596, 604–05 (Tex.App.—Tyler 2005, pet. denied)(stating motion for JNOV is timely as long as trial court retains jurisdiction over the case); *Needville Indep. Sch. Dist. v. S.P.J.S.T. Rest Home*, 566 S.W.2d 40, 42 (Tex.App.—Beaumont 1978, no writ)(stating motion for JNOV can be filed after judgment is entered but before it becomes final). Here, Appellants filed their motion less than thirty days after the judgment was signed, while the trial court retained plenary power over the case. *See* TEX.R.CIV.P. 329b(d)("The trial court . . . has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed."). Accordingly, it was timely by any of the intermediate courts' precedent on the issue. *See, e.g.*, *Thomas*, 825 S.W.2d at 141; *BCY Water Supply Corp.*, 170 S.W.3d at 604–05; *Needville Indep. Sch. Dist.*, 566 S.W.2d at 42.

awarded based on the nature of the wrong alleged, the character of the conduct involved, the degree of culpability of each Appellant, and each Appellant's net worth, among other things. For the reasons alleged, Appellants requested the trial court set aside its judgment and render judgment in favor of the Appellants.

Similarly, in their motion for new trial, Appellants posit the evidence is factually insufficient to support the jury's findings, and a new trial is warranted. For each of the reasons raised in the motion for JNOV regarding the legal insufficiency of the evidence, Appellants' motion for new trial extends the same arguments to the factual sufficiency of the evidence. They asked the court to set aside its judgment and grant Appellants a new trial.

Appellants' motion for JNOV and motion for new trial were overruled by operation of law on May 27, 2020. *See* TEX.R.CIV.P. 329b(c). This timely appeal followed.

## DISCUSSION

Appellants raise the following five issues:

1. Whether an LLC member can be held personally liable for the obligations of the LLC or its employees where (a) the member owed no independent legal duty as a matter of law, (b) Appellees failed to plead, prove, or obtain jury findings on vicarious liability theories of alter ego, respondeat superior, single business enterprise, joint venture, or negligent entrustment, and (c) the evidence is legally and factually insufficient to prove an act or omission by the member caused the occurrence or damages claimed by the Appellees;

2. Whether an LLC can be independently responsible, jointly and severally liable, and responsible for exemplary damages when (a) the evidence is legally and factually insufficient to prove the LLC's tortious acts caused the occurrence or damages claimed by the Appellees, and (b) Appellees failed to request or obtain jury instructions regarding ratification or authorization of an employee's alleged gross negligence or a vice-principal's alleged gross negligence;

3. Whether legally and factually sufficient evidence under a clear and convincing standard supports imposing exemplary damages;

4. Whether a new trial is proper because the jury's excessive damage award reflects passion, prejudice, or improper motive rather than actual compensation; and

14

5. Alternatively, if this Court does not remand for a new trial or render judgment for Appellants, whether the exemplary damages awards are legally, statutorily, or constitutionally excessive.

### *Legal and Factual Sufficiency Standards of Review*

A legal sufficiency or "no evidence" challenge will only be sustained on appeal if the record demonstrates: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Dallas Nat. Ins. Co. v. Morales*, 394 S.W.3d 826, 831 (Tex.App.—El Paso 2012, no pet.); *Region XIX Serv. Ctr. v. Banda*, 343 S.W.3d 480, 484 (Tex.App.—El Paso 2011, pet. denied); *El Paso Indep. Sch. Dist. v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.—El Paso 2006, no pet.). When conducting a legal sufficiency review, we consider the evidence in the light most favorable to the verdict, crediting favorable evidence if a reasonable juror could, and disregarding contrary evidence unless a reasonable juror could not. *City of Keller*, 168 S.W.3d at 810; *Region XIX Serv. Ctr.*, 343 S.W.3d at 485. "[A]n appellate court conducting a legal sufficiency review cannot 'disregard undisputed evidence that allows of only one logical inference.'" *City of Keller*, 168 S.W.3d at 814 (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519–20 (Tex. 2002)). The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller*, 168 S.W.3d at 827.

When reviewing the factual sufficiency of evidence, we examine all the evidence and set aside a finding only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Under both a legal and factual sufficiency review, we are mindful that the jury, as fact finder, is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d

15

at 819. We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). However, "proper review [by an appellate court] also prevents jurors from substituting their opinions for undisputed truth. When evidence contrary to a verdict is conclusive, it cannot be disregarded." *City of Keller*, 168 S.W.3d at 817.

### *Issue No. 1: Liability of Croom, Individually*

In its first issue, Appellants argue Croom cannot be held personally responsible for Appellees' damages because she is shielded from individual liability for EBL or Rayner's actions based on her role as a member–manager of the LLC. Appellants further assert Appellees failed to plead, prove, or secure jury findings on any theory of vicarious liability, which could impute another's actions to Croom, and the theories of liability Appellees did plead against her were unsupported by the evidence. Finally, Appellants claim the evidence at trial does not support a finding Croom owed any independent duty to the Appellees, and the evidence was legally and factually insufficient to support a finding any action taken by her proximately caused the occurrence. For these reasons, Appellants ask this Court to reverse the trial court's judgment and render judgment in Croom's favor.

Appellees counter Croom was personally liable to Appellees as a result of her own acts of negligence and gross negligence, not acts of the business which were imputed to her. Appellees also contend Appellants waived any objection to Croom's submission to the jury on the question of liability because Appellants failed to object to her submission in the charge conference and included her name in the apportionment of liability question on their own version of the proposed charge. We consider the waiver assertion first.

16

**Waiver of Error**

Whether a defendant owes a plaintiff a legal duty of care is a threshold issue which the plaintiff must prove to succeed on a negligence claim. *See Nabors Drilling, U.S.A., Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009); *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017). Where no duty exists, a defendant cannot be liable in tort. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006). The existence of a duty is typically a question of law. *Nabors Drilling*, 288 S.W.3d at 404. In very rare cases, where a duty has not previously been recognized in the factual circumstances present in a case, a fact finder may be called upon to resolve factual questions that could determine whether a duty should exist. *Pagayon*, 536 S.W.3d at 503–04. However, "such cases are unusual." *Id.* at 504 (citing *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2009)(noting only one instance where a fact finder had to resolve fact issues determinative of whether a duty should be imposed)).

Appellees cite *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) for the proposition, that failure to object to a legal issue before it is submitted to a jury waives any argument on appeal the issue should have been decided differently by the trial court. *Id.* In *Osterberg*, the Supreme Court considered whether this Court should have considered the sufficiency of the evidence on a standard of compliance related to campaign expenditure reporting which was different than the standard of compliance question submitted to the jury. *See id.* at 54–55 ("The Osterbergs could instead be arguing that when a court submits a defective issue to the jury, an appellate court should review the sufficiency of the evidence against the question and instruction that the trial court *should* have submitted . . . even if the defect was never brought to the court's attention and the question or instruction never requested.")(Emphasis added.) There, the appellants failed to object to the standard submitted to the jury on the charge, and the standard they contended should have been submitted to the jury was never requested. *Id.* at 55. The court in *Osterberg* and the Appellees

also cite to *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999). *See Osterberg*, 12 S.W.3d at 55. In *Holland*, the Supreme Court noted a trial court must "resolve a legal issue before the jury [can] properly perform its fact-finding role[;]" a party's failure to object to the issue and thus apprise the trial court of potential error and give it time to cure the error waives any complaint about the issue on appeal. 1 S.W.3d at 94. However, the *Holland* court also noted purely legal questions are analogous to legal sufficiency challenges, which can be raised for the first time in a motion for JNOV. *Id.*

Finally, Appellees cite *Dao v. Garcia*, 486 S.W.3d 618, 628 (Tex.App.—Dallas 2016, pet. denied). There, the appellant submitted a proposed jury charge including her name in the apportionment of responsibility question on a negligence case involving operation of a motor vehicle. *See id.* at 627. *Dao* too involved allegations of direct and derivative liability against the appellant after her friend borrowed her car and crashed while driving it. *See id.* at 620–21. On appeal, the appellant claimed it was error for her name to be included in the apportionment of responsibility question to the jury. *Id.* at 627. The court held because the appellant's proposed charge of court included her name in the apportionment question, the appellant invited the error complained of. *Id.* at 627–28. Accordingly, the court found she waived the issue on appeal. *Id.* at 628.

In their reply brief, Appellants counter legal and factual insufficiency arguments regarding the sufficiency of the evidence to submit a question to the jury may be raised for the first time after the verdict. *See* TEX.R.CIV.P. 279. Citing to *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991), they claim the motion for JNOV and motion for new trial preserved their claim Croom owed no duty to Appellees as a matter of law. *See id.* (stating legal and factual sufficiency arguments may be raised for the first time in a motion for new trial). Appellants further argue the proposed charge

they submitted to the trial court was done so prior to trial, and under the charge submitted to the jury, the evidence, as a matter of law, is legally and factually insufficient to show Croom owed a duty to Appellees.[2]

We must look at the substance of Appellants' arguments regarding Croom's individual liability to determine whether they were properly preserved for appeal. Their arguments regarding Croom's individual liability are three-fold: (1) she owed no independent duty to Appellees as a matter of law; (2) Appellees failed to plead or prove any theory of liability against Croom that could impute the actions of another to her; and (3) the evidence is legally and factually insufficient to prove Croom's actions caused the harm alleged by the Appellees. We examine the alleged waiver of each subargument in turn.

First, we hold Croom did not waive her no-duty argument by failing to object to the jury charge based on the nature of her complaints on appeal. If she were arguing the trial court erred in submitting her name in the apportionment of liability question, she would have waived this complaint by failing to object at the formal charge conference and by inviting error when she included her name in the general negligence question on Appellants' proposed charge of court. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 482 (Tex. 2017)("We have acknowledged that a defendant may invite error and waive its argument on appeal when it persuades a trial court to

---

[2] Regarding Appellants' alleged failure to object to Croom's inclusion on the apportionment of liability, in the discussion between the parties' counsel and the trial court regarding questions for submission to the jury, counsel for Appellees moved for directed verdict "on the issue of negligence as to each of the defendants," as well as the issue of gross negligence. Appellants' counsel objected, arguing the issues should "still go[] to the jury" because there was "still a question of facts and [Appellants] disagree on [Appellees' counsel's] interpretation of the evidence." The trial court granted the motion for directed verdict, stating, "[O]ur jury charge leads straight to causation -- proximate cause, rather, which I think is fine. So I will grant that directed verdict at this time." Following this exchange, the trial court held its "formal charge conference" in which it explained it submitted a version of a charge to the parties for review and asked if either side disagreed with its submission to the jury. Neither side lodged an objection. In the jury charge, there was no question submitted to the jury regarding whether Croom was negligent; rather, the first question asked of the jury was whether the negligence of Rayner, EBL, or Croom proximately caused the occurrence in question. Thus, while Appellants lodged an objection to the directed verdict on the issue of each Appellant's negligence, they did not object to the submission of each Appellant's name in the apportionment of responsibility question.

19

adopt a jury charge that it later alleges supports an improper theory of recovery.")(citing *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 775–76 (Tex. 2010)). However, Croom did not object to the charge as submitted on the general negligence question. Rather, her no-duty argument reflects her legal sufficiency challenge, in which she argues a complete absence of a vital fact—that is, the existence of an independent duty owed to the Appellees. *City of Keller*, 168 S.W.3d at 810. As stated previously, legal and factual sufficiency arguments may be raised for the first time in a motion for new trial. *See Cecil*, 804 S.W.2d at 510–11. Here, Appellants' complaint regarding the legal and factual sufficiency of the evidence against Croom in their motion for JNOV and motion for new trial. Accordingly, she preserved error on the sufficiency grounds regarding existence of a legal duty. *Id.*

We need not determine whether she preserved the issue of Appellees' failure to plead or prove vicarious liability against her. Appellees argue they were not required to plead or prove vicarious liability against Croom because they "did not seek to hold Croom liable for the acts of either Rayner or EBL, but for her own negligence and gross negligence." Accordingly, to the extent their amended petition asserted vicarious liability against Croom, those claims were abandoned at the time of trial. *See Wingert v. Devoll*, No. 03-09-00440-CV, 2010 WL 3271744, at *1 (Tex. App.—Austin Aug. 20, 2010, pet. denied)(recognizing that claims may be abandoned by the claimant during the trial).

Finally, we find Croom did not waive her argument regarding the legal and factual sufficiency of the evidence regarding causation. *See Cecil*, 804 S.W.2d at 510–11 (indicating legal and factual sufficiency arguments may be raised for the first time in a motion for new trial). Here, Appellants complained of the legal and factual sufficiency of the evidence against Croom as to causation in their motion for JNOV and motion for new trial. Accordingly, she preserved error on

20

the sufficiency grounds as they pertain to proximate cause. *Id.*

We find Croom preserved error on her complaints regarding the legal and factual sufficiency of the evidence regarding the elements of duty and proximate cause. We proceed to our analysis of the merits of Appellants' first issue on appeal.

**Sufficiency of Evidence Proving Croom's Individual Liability**

In its first issue, Appellants argue Croom cannot be held personally responsible for Appellees' damages because she is shielded from individual liability for EBL or Rayner's actions as a member–manager of the LLC. She also argues Appellees failed to plead, prove, or secure jury findings on any theory of vicarious liability, which could impute another's actions to her, and the theories of liability they did plead were unsupported by the evidence. Finally, Croom claims the evidence does not support a finding she owed any independent duty to Appellees, and the evidence was legally and factually insufficient to support a finding any action taken by her proximately caused the occurrence.

We have already determined Appellees abandoned any claims of vicarious liability against Croom. Accordingly, our analysis of Croom's first issue is limited to (1) the sufficiency of the evidence regarding what, if any, duty(ies) Croom owed to Appellees under the theories of individual liability pleaded against Croom, and if necessary, (2) the sufficiency of the evidence regarding Croom's negligence as to the proximate cause of the occurrence.

Appellees argue Croom was personally liable for her own acts of negligence and gross negligence, not acts of the business which were imputed to her. However, they further cite to case law in support of the theory; "a corporate officer may be held individually liable for the tortious acts of the corporation if he directed, participated in, or had knowledge of or assented to, the wrongful conduct." *Luna v. State*, No. 03-96-00555-CV, 1997 WL 334955, at *3 (Tex.App.—

21

Austin June 19, 1997, no pet.)(citing *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 375

(Tex. 1984)). They also cite to several cases which found a member of an LLC is liable for his or

her own tortious actions. *See State v. Morello*, 547 S.W.3d 881, 888 (Tex. 2018); *Deaton v.*

*Moreno*, No. 02-16-00188-CV, 2017 WL 4683940, at *5 (Tex.App.—Fort Worth Oct. 19, 2017,

pet. denied)(mem. op.); *Key v. Richards*, No. 03-14-00116-CV, 2016 WL 240773, at *2

(Tex.App.—Austin Jan. 13, 2016, no pet.) (mem. op.); *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712

(Tex.App.—San Antonio 2008, no pet.); *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002);

*Coleman v. Savoie*, No. 03-97-00548-CV, 1998 WL 305322, at *3 (Tex.App.—Austin June 11,

1998, no pet.); *Kerr v. Lambert*, No. 03-19-00359-CV, 2020 WL 6266005, at *9 (Tex.App.—

Austin Oct. 23, 2020, no pet.)(mem. op.); *Chico Auto Parts & Serv., Inc. v. Crockett*, 512 S.W.3d

560, 575 (Tex.App.—El Paso 2017, pet. denied). However, we find none of the authority relied

upon by Appellees in support of this position is instructive.[3]

---

3 In *Luna v. State*, Luna, the officer and director of a corporation, was found individually liable for conversion and breach of fiduciary duty because he personally "wrongfully assum[ed] and exercise[ed] dominion over the tax money collected to the exclusion of the State and in a manner inconsistent with the State's rights in the property." *Luna*, 1997 WL 334955, at *3. Although the tax monies were collected by the corporation for which he worked, Luna was still liable in his individual capacity as the wrongful actor who converted the monies. *See id.*

In *State v. Morello*, Morello was the single member of an LLC which owned property that was subject to various environmental law compliance obligations mandated by the Texas Commission on Environmental Quality and the Texas Water Commission. *Morello*, 547 S.W.3d at 883. TCEQ notified Morello and his LLC that they were in violation of the compliance plan and pursued enforcement of the plan and subsequently sued the LLC and Morello individually. *Id.* The Texas Supreme Court ultimately determined Morello was personally liable for the civil penalties assessed for the violations based on the Water Code's provision allowing the penalties to be assessed against "a person." *Id.* at 885–86 (applying the plain meaning of "person," which includes an individual, where the term was not defined in the Water Code).

In *Deaton v. Moreno*, Deaton was an attorney who was not shielded from liability for his own alleged negligence in committing legal malpractice and breach of fiduciary duties. *Deaton*, 2017 WL 4683940, at *2, 5. In *Key v. Richards*, the Austin court of appeals reiterated the tenet "an entity's agent is personally liable for his own fraudulent or tortious acts." *Key*, 2016 WL 240773, at *2. That case involved corporate officers who committed a fraudulent transfer of assets to avoid payment on a judgment. *Id.* at *1–2.

In *Sanchez v. Mulvaney*, the San Antonio court reversed a summary judgment where the trial court erroneously found the plaintiffs were required to pierce the corporate veil to find the individual defendants liable for non-contract—that is, tortious—claims against them. *Sanchez*, 274 S.W.3d at 712. While the court of appeals did not make a finding against the corporation's agents, it noted agents are personally responsible for their own tortious conduct even when acting in the course and scope of their employment. *Id.* (citing *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002)).

We recognize the rule relied upon by Appellees in which an individual can be liable for his or her own tortious actions even when they are committed in the course and scope of their employment or at the direction of their employer. *See, e.g.*, *Chico Auto Parts*, 512 S.W.3d at 575. However, we also recognize the long-standing rule that the judgment must conform to the pleadings. *See* TEX.R.CIV.P. 301. As our sister court in Houston wrote:

> A court's jurisdiction to render judgment is invoked by the pleadings, and a judgment unsupported by the pleadings is erroneous. Therefore, a trial court's judgment must conform to the pleadings. In determining whether the judgment conforms to the pleadings, we must view the pleadings as a whole. A general prayer for relief will support any relief raised by the evidence **that is consistent with the allegations and causes of action stated in the petition**. Absent trial by consent, a claimant may not be granted a favorable judgment on an unpleaded cause of action.

*Moran v. Williamson*, 498 S.W.3d 85, 93–94 (Tex.App.—Houston [1st Dist.] 2016, pet. denied)(emphasis added)(internal citations omitted).

In considering the sufficiency of the evidence regarding what, if any, duties Croom owed Appellees under the theories of individual liability pleaded against her, we must first look to the pleadings to ascertain the theories of individual liability raised in the pleadings. *See Marrs & Smith P'ship v. D.K. Boyd Oil and Gas Co., Inc.*, 223 S.W.3d 1, 18 (Tex.App.—El Paso 2005, pet. denied)(citing *Oil Field Haulers Ass'n v. R.R. Comm'n*, 381 S.W.2d 183, 191 (Tex. 1964))(noting that judgment may not be granted on an unpled cause of action); *see also* TEX.R.CIV.P. 301. The theories of liability alleged against Croom are respondeat superior, alleging she was responsible for all acts or omissions of her agent(s); negligence for various failures to use ordinary care in

---

Likewise, in *Miller*, the Supreme Court noted the same principle applies to corporate agents who make misrepresentations in the course and scope of their duties for the corporation. *Miller*, 90 S.W.3d at 717; *see also Kerr*, 2020 WL 6266005, at *9 (stating corporate agent can be liable for his own misrepresentations); *Chico Auto Parts*, 512 S.W.3d at 575 (stating corporate "affiliate" can be personally liable for his torts, such as fraud by misrepresentation).

In *Coleman v. Savoie*, an employee was found individually liable for obstructing the plaintiff's easement when he constructed a sidewalk over it at the behest of his employer, who owned the servient estate. *See Coleman*, 1998 WL 305322, at *3–4. The court noted the employee, as the wrongful actor, was liable for his own conduct even though it was done in the course and scope of his employment. *Id.* at *4.

operating a vehicle; negligence per se for violations of Texas state law in failing to adhere to restrictions related to overweight and over-height loads; and gross negligence, alleging her "operat[ion] [of] a motor-vehicle with reckless disregard of the rights of others . . . was a proximate cause of the damages suffered by [Appellees]".[4] Additionally, in the request for exemplary damages, Appellees argue Croom's failure, in addition to EBL's, in exercising due care in hiring drivers, training and supervising employees, overloading the truck, and changing the route, constituted an extreme degree of risk and demonstrates a conscious indifference to the safety of others.

First, we decline to consider any theory of liability asserted against Croom based on vicarious liability since Appellees concede their claims against Croom individually involve only actions she personally committed that were tortious. Next, we consider the claims for negligence and negligence per se. Appellees argue Croom is liable for negligence and negligence per se for various failures related to operation of the vehicle and failing to comply with restrictions for oversized vehicles. However, it was conclusively proven at trial Rayner, and not Croom, was operating the vehicle when it struck the bridge. Thus, Croom cannot be liable for negligence or negligence per se under any theory related to unsafe operation of the vehicle because she personally was not operating the vehicle at the time of the incident, and any claim Rayner's actions can be imputed to her have been abandoned. The same is true for allegations Croom personally violated Texas law by failing to adhere to restrictions on travel related to oversized vehicles since she was not operating the truck at the time it deviated from the permitted route and crashed into the overpass.

_____

[4] Appellees also alleged single business enterprise/joint venture against Croom in combination with EBL and Rayner, claiming the three "integrated their resources to achieve a common business purpose," out of which arose this incident. However, this cause of action appears to have been abandoned during the course of the litigation. It was not raised as a basis for recovery at trial or in this appeal. Accordingly, we do not consider it on appeal.

Finally, Croom cannot be liable under any theory related to negligent hiring, training, or supervising employees, as Appellees allude to under their request for exemplary damages. Claims for negligent hiring, supervision, and training are properly made only against the tortfeasor's employer; establishing an employer–employee relationship between the defendant and the tortfeasor is a prerequisite to establishing the duty element. *See Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 294 (Tex. 1996). In this case, the evidence conclusively proves Rayner was an employee of EBL, acting in the course and scope of his employment with EBL when the incident occurred. There is no evidence Croom was his employer. Therefore, Croom owed no duty under a negligent hiring, training, or supervision theory, if such a theory can be inferred from Appellees' pleading. *See id.*

The only evidence adduced at trial regarding Croom's individual responsibility for the incident is her testimony she "take[s] responsibility . . . as a person [and on behalf of her] company" for the accident. She answered affirmatively when asked if she herself was also to blame. This also appears to be the only evidence upon which Appellees base their contention Croom's own acts of negligence caused or contributed to the accident occurring. Other than the various "admissions," as Appellees refer to them, regarding unsafe trucking practices putting the public in danger and Croom's testimony she took some responsibility for the accident occurring, Appellees do not discuss any other evidence adduced at trial which they claim implicates Croom's actions to causing the accident. They do not state any alleged facts which confers a duty of care on Croom, individually. Rather, they argue Croom's testimony in which she agrees unsafe trucking practices put the public's lives in danger and admission of responsibility for the accident serve as a judicial admission of gross negligence. We disagree.

"A judicial admission results when a party makes a statement of fact which conclusively

25

disproves a right of recovery or defense he currently asserts." *H.E. Butt Grocery Co. v. Pais*, 955 S.W.2d 384, 389 (Tex.App.—San Antonio 1997, no pet.)(citing *Gevinson v. Manhattan Constr. Co. of Okl.*, 449 S.W.2d 458, 466 (Tex. 1969)). Only assertions of fact can be judicially admitted. *Houston First Am. Sav. v. Musick*, 650 S.W.2d 764, 767 (Tex. 1983). Questions of law cannot be decided by judicial admission. *Jang Won Cho v. Kun Sik Kim*, 572 S.W.3d 783, 798 (Tex.App.—Houston [14th Dist.] 2019, no pet.); *Pierce v. Pierce*, 850 S.W.2d 675, 679 (Tex.App.—El Paso 1993, writ denied). The existence of a legal duty of care is a question of law. *See Nabors Drilling*, 288 S.W.3d at 404; *see also Julian v. Patel*, No. 06-01-00128-CV, 2002 WL 1300016, at *3 (Tex.App.—Texarkana June 14, 2002, no pet.)(explaining where appellant's pleading stated he was an independent contractor, the statement could not be considered a judicial admission because it was a "legal conclusion" that implicated questions of what duties, if any, appellees owed to appellant).

Appellees cite *Medina v. Hart*, 240 S.W.3d 16, 23-24 (Tex.App.—Corpus Christi-Edinburg 2007, pet. denied) for the proposition that negligence and causation can be judicially admitted. *Id.* at 23. In *Medina*, a medical malpractice case, the defendant doctor testified she had a duty of care to the patient, she breached that duty of care when she placed a hot IV bag under the patient's arm, and the placement of the hot IV bag under the patient's arm caused the burn injury claimed by the plaintiff. *Id.* In that case, the Corpus Christi court found the doctor's testimony constituted judicial admissions under the test laid out in *Griffin v. Superior Ins. Co.*, 338 S.W.2d 415, 419 (Tex. 1960) upon which Appellees rely. *Medina*, 240 S.W.3d at 24 (citing *Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex. 1980), which in turn applies the *Griffin* test).

Appellees' reliance on *Medina* is misplaced. In *Medina*, the parties did not dispute the

26

doctor owed her patient a duty of care. *See Medina*, 240 S.W.3d at 24. Moreover, the doctor not only testified regarding the scope of that duty—a "duty to ensure proper positioning of her patient to avoid injury"—she also provided clear, unequivocal statements of fact demonstrating her breach of that very duty. *See id.* (finding a doctor judicially admitted negligence and causation where the doctor testified the IV bag she placed under the patient's arm was warm and caused the patient's burn; the patient was diagnosed with a burn in the exact location where she had placed the bag; and a doctor should not place a hot IV bag under a patient's arm, as doing so would breach the standard of care). In other words, the statements constituting judicial admissions in *Medina* involved purely issues of fact regarding breach of duty and causation; they did not convey a duty of care upon the doctor where one did not already exist as a matter of law.

Here, Croom's testimony in which she "takes responsibility" for the accident is not a judicial admission because it does not impart a duty upon Croom individually where one does not otherwise exist. *See Musick*, 650 S.W.2d at 767 (stating only assertions of fact can be judicially admitted); *Pierce*, 850 S.W.2d at 679 (stating questions of law cannot be decided by judicial admission); *Nabors Drilling*, 288 S.W.3d at 404 (stating whether a duty exists is a question of law). Unlike the judicial admissions made in *Medina*, Croom's statements she "takes responsibility" for the accident and is partly to blame for it occurring is a legal conclusion which cannot serve as a judicial admission because it implies Croom owes a duty of care to Appellees in her individual capacity when Appellees have not articulated a viable theory of recovery against her in their pleadings.

Additionally, Appellees have not directed us to any actions taken by Croom which could be construed as tortious. They reference Croom's testimony that she was aware, prior to the crash occurring, unsafe trucking practices put the entire population of the State of Texas at risk.

27

However, general awareness is not evidence that Croom personally endangered the driving population of the state or otherwise owed any individual duty to the Appellees as it relates to the incident in this case. Further, Appellees argue Croom's actions in hiring Scott as EBL's safety coordinator without adequately vetting his experience in safety training resulted in Scott failing to adequately train drivers on performing pre-trip inspections, thereby allowing the vehicle in question to leave the yard with preexisting safety violations. However, even if the jury determined these actions by Croom caused the accident, they cannot confer a legal duty on Croom. As we previously discussed, a duty of care related to hiring, training, and supervising employees lies only with the employer of those employees. *See Golden Spread Council*, 926 S.W.2d at 290, 294. To impart liability upon Croom for negligent hiring of Scott, Appellees were required to prove an employer–employee relationship existed between the two. *See id.* Appellees did not. Rather, the evidence at trial conclusively proved EBL was Scott's employer.

We find the evidence is legally and factually insufficient to establish the existence of a duty owed by Croom individually to the Appellees. In the absence of a duty owed by Croom, their negligence and gross negligence claims against Croom in her individual capacity fail as a matter of law. *See Nabors Drilling*, 288 S.W.3d at 404; *Pagayon*, 536 S.W.3d at 503; *Kroger*, 197 S.W.3d at 794. We need not consider the subquestion under this issue regarding the sufficiency of the evidence proving causation.

Appellants' first issue is sustained.

### Issue No. 2: Sufficiency of the Evidence that EBL's Negligence Proximately Caused the Incident

In their second issue, Appellants contend the evidence adduced at trial is legally and factually insufficient to support the jury's finding on causation as it pertains to EBL. They argue Appellees' failure to request or obtain jury findings regarding negligent entrustment precludes

recovery under that theory. Appellants also assert Appellees elicited no evidence EBL instructed Rayner to deviate from the TxDOT-approved route, and EBL was not aware Rayner deviated from the route until after the incident occurred. They complain Appellees' theory—the combination of insufficient training of their drivers, improper documentation of pre-trip inspections, and evidence of violations on the truck driven by Rayner at the time of the incident—constitutes negligence and gross negligence does not support a finding of causation sufficient to impose liability upon EBL.

Conversely, Appellees urge they produced sufficient evidence of EBL's independent acts of negligence for failing to ensure proper working condition of the truck Rayner drove and failing to enforce policies preventing distracted driving. They claim Rayner's negligent acts were a "continuing and cooperating proximate cause" of the incident in addition to EBL's negligence. They rely on Croom's testimony that EBL was responsible for putting an unsafe vehicle on the road, in conjunction with Rayner's "distracted driving," which worked in concert to cause the incident. They submit the separate jury questions regarding their independent theories of liability were unnecessary and the question of EBL's negligence being a proximate cause of the incident was properly submitted under a broad-form question.

Where one person or entity owes another a duty of care, and a breach of that duty causes the other damages, the person owing the duty is negligent. *See Nabors Drilling*, 288 S.W.3d at 404. Where the damages alleged by the injured party cannot be causally connected to the actions of the other—even if the other owes the injured party a duty of care and breaches it—negligence has not occurred. *See W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551–52 (Tex. 2005).

"Proximate cause consists of two elements: cause-in-fact and foreseeability." *Read v. Scott Fetzer Co.*, 990 S.W.2d 732, 737 (Tex. 1998). When the record shows some evidence an act or omission of the defendant "'was a substantial factor in bringing about injury,' without which the

harm would not have occurred[,]" the cause-in-fact element is met. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)(quoting *Prudential Ins. Co. of Am. v. Jefferson Assoc., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995)). Foreseeability considers whether "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission." *Read*, 990 S.W.2d at 737. Foreseeability does not require a person to anticipate the precise manner in which injury will occur once he has created a dangerous situation through his negligence. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Instead, where an injury "reasonably [should] have been contemplated because of the defendant's conduct[,] . . . [and] not [by] simply viewing the facts in retrospect and theorizing an extraordinary sequence of events by which the defendant's conduct caused the injury[,]" the foreseeability element is satisfied. *Read*, 990 S.W.2d at 737.

As we did for Croom, we must first survey which theories of liability Appellees alleged against EBL to determine the sufficiency of the evidence on each alleged theory. The first amended petition alleges vicarious liability against EBL for the negligence and negligence per se of its employee, Rayner; negligent entrustment of the vehicle to Rayner; and negligent hiring, training, and supervision of Rayner. Appellees also alleged gross negligence against EBL. Additionally, although not factually pleaded, negligence and gross negligence for acts committed by EBL regarding the maintenance and condition of the EBL truck driven by Rayner were tried by consent of the parties. *See Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009)("When both parties present evidence on an issue and the issue is developed during trial without objection, any defects in the pleadings are cured at trial, and the defects are waived.").

With this framework in mind, we consider all the evidence in the light most favorable to the jury's verdict finding EBL's negligence under one or more of the theories asserted to have caused or contributed to the occurrence. *See City of Keller*, 168 S.W.3d at 810; *Region XIX Serv.*

*Ctr.*, 343 S.W.3d at 485 (legal sufficiency). We will set aside a finding only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176 (factual sufficiency).

We first consider Appellees' position EBL's independent acts of negligence—negligent entrustment; negligent hiring, training, and supervision; and negligent maintenance of their vehicles—were a proximate cause of the occurrence.

### Negligent Entrustment and Negligent Hiring, Training, or Supervising

Because of the similarity in the elements of the two claims, we consider the negligent entrustment and negligent hiring, training, or supervising claims in tandem.[5] In a negligent entrustment claim, the evidence must show "(1) entrustment of a vehicle by the owner; (2) to an unlicensed, incompetent, or reckless driver; (3) that the owner knew or should have known to be unlicensed [or incompetent or reckless], (4) that the driver was negligent on the occasion in question and (5) that the driver's negligence proximately caused the accident." *Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987); *TXI Transp. Co. v. Hughes*, 224 S.W.3d 870, 917 (Tex. App.—Fort Worth 2007) *rev'd on other grounds*, 306 S.W.3d 230 (Tex. 2010). "For entrustment to be a proximate cause, the defendant entrustor should be shown to be reasonably able to anticipate that an injury would result as a natural and probable consequence of the entrustment." *Schneider*, 744 S.W.2d at 596. Knowing the driver to be incompetent or reckless "at the time of the entrustment is an essential element to establish negligence." *TXI Transp. Co.*, 224 S.W.3d at 917 (citing *Briseno v. Martin*, 561 S.W.2d 794, 796 n.1 (Tex. 1977)).

Negligent hiring, training, or supervising claims require the plaintiff to prove the employer

---

[5] Appellees also make negligent training and supervising claims related to EBL's training and supervision of employees in inspecting and maintaining the vehicles. We consider those allegations alongside our analysis of the negligent maintenance claim.

31

owed the plaintiff a legal duty to hire, supervise, and train competent employees, which the employer breached, and the breach proximately caused the plaintiff injury. *See Bedford v. Moore*, 166 S.W.3d 454, 463–64 (Tex.App.—Fort Worth 2005, no pet.). "[T]he theory of negligent hiring and supervision does require that a plaintiff's harm be the result of the employment." *See Houser v. Smith*, 968 S.W.2d 542, 544 (Tex.App.—Austin 1998, no pet.). "The basis of responsibility under the doctrine of negligent hiring is the master's negligence in hiring . . . an incompetent servant whom the master knows or by the exercise of reasonable care should have known was incompetent or unfit and thereby creating an unreasonable risk of harm to others." *Arrington's Est. v. Fields*, 578 S.W.2d 173, 178 (Tex.App.—Tyler 1979, writ ref'd n.r.e.).

The bases for both causes of action when brought against a tortfeasor's employer is the employer's knowledge, either actual or constructive, that the employee it hires is unfit for the work the employee is hired to do. *See Schneider*, 744 S.W.2d at 596 (negligent entrustment); *Houser*, 968 S.W.2d at 544 (negligent hiring, training, or supervision). In the specific case of negligent entrustment, the incompetence relates to the employee's ability to operate a vehicle. *See Schneider*, 744 S.W.2d at 596.

Appellees point to the following evidence which they claim supports the jury's proximate cause findings against EBL:

- EBL hired Scott as the company's safety manager even though he was "not in the business of teaching or instructing" EBL's drivers.

- EBL offered "no training on anything[,]" including safety training, to its drivers.

- Croom testified she "knew prior to the crash . . . that operating a trucking company unsafely would unreasonably put the motoring public at significant risk of death or serious bodily injury[.]"

- Croom testified EBL was required to follow the provisions of the FMCSA regulations, the purpose of which is to ensure "safety on the roads and highways for every one of us[.]"

- EBL did not have any of its own written manuals or formal safety training process other than telling its drivers to "[b]e careful."

- Croom admitted that distracted driving is a known danger to travelers on the roadway.

- EBL had "no policies whatsoever related to the drivers's [sic] use of cell phones in their 18-wheeler trucks[.]"

In their brief, Appellees rely on *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 114 (Tex.App.—Beaumont 2001, pet. denied) in support of their position that EBL's actions separate and apart from Rayner were a proximate cause of the accident and Appellees' damages. In *Emmons*, the plaintiff was paralyzed from the waist down after the vehicle in which he was a passenger was rear-ended by a moving van. *Id.* at 112. The driver of the moving van did not have a commercial driver's license because he could not meet the vision requirements to obtain one. *Id.* He had also failed the written exam for a commercial license twice. *Id.* The driver's statutory employers, who were defendants in the case, argued there was factually insufficient evidence to support the jury's finding their negligent entrustment of the vehicle to the driver was a proximate cause of the collision. *Id.* They argued despite the driver's lack of a driver's license and his impaired vision, "[he] was a legally competent driver[.]" *Id.* at 113.

The court in *Emmons* held, due to the driver's impaired vision and lack of skill, it was foreseeable he would not be able to operate the moving van in a safe enough manner to avoid an accident. *Id.* at 114. Additionally, evidence presented to the jury indicated the employers were "aware of the risks of unqualified, unlicensed drivers . . . and had the ability to control 'things that [were] done in its service[.]'" *Id.* Among the things the employers could control were inspecting the records kept by their agent, which hired the driver "to ensure compliance with the law and with [the employers'] driver requirements and safety regulations," and discipline the agent when it failed in that regard. *See id.* at 113. For those reasons, the Beaumont Court of Appeals found the evidence legally and factually sufficient to support the findings on proximate cause. *Id.* at 113-14.

We find the facts in *Emmons* regarding proximate cause distinguishable from the facts here. Here, the evidence did not indicate Mr. Rayner was an unskilled, untrained, or otherwise unqualified driver. He had a valid, current commercial driver's license and forty-five years of experience as a commercial truck driver. He has taken various road tests and written tests on the operation of commercial vehicles during his career. He testified he knew the rules of the road and knew he was obligated to comply with state and federal regulations while operating a commercial truck. Rayner knew he was operating an oversized load and that he was required to adhere to TxDOT's route of travel on the oversized load permit. Furthermore, although Rayner testified he had a prescription for corrective eyewear from the VA, it was only for reading glasses; his commercial driver's license and his medical card did not contain any vision restrictions.

Specifically with respect to the distracted driving allegations and Rayner's use of his cell phone while driving, Croom acknowledged the danger distracted driving poses to the driving public. She testified if a driver was required to use more than one touch to answer or make a call from a cell phone while driving, it would be a violation of the rules regarding cell phone use for commercial truck drivers. There was also testimony Rayner owned and used a flip phone in combination with a headset when the incident happened. However, there was no evidence submitted to the jury regarding when during Rayner's trip he was using his cell phone or whether he had to use more than one touch to answer or make calls. He testified when he used his phone while driving, it was through the hands-free headset. Rayner said he spoke with his wife multiple times so she could read the TxDOT directions to him. He also testified he called her when he realized he was driving in the wrong direction. However, he testified he was not on the phone when the incident happened. The record is silent as to whether Rayner was using his phone when he took the wrong exit.

34

Here, we find there is no more than a mere scintilla of evidence indicating Rayner was an untrained or otherwise incompetent driver. In fact, the evidence shows he had ample experience as a commercial truck driver, a clean driving record, and had a solid understanding of the rules of the road and the state and federal regulations with which he was required to comply. He testified that he was aware that if he deviated from the TxDOT route, which he was not allowed to do, he was supposed to stop, pull over, or turn around once it was discovered.

We also find there is no more than a scintilla of evidence which shows EBL knew, or through reasonable inquiry should have known, Rayner was incompetent or otherwise unfit to operate the vehicle or complete his work for EBL as a commercial truck driver. Instead, the evidence presented through Rayner's testimony was he took the wrong exit by "accident [because he] didn't know where [he] was at, [or] where [he] was going[,]" not as the result of incompetence in how to operate the vehicle.

Counsel for Appellees elicited testimony from Rayner that the cause of the crash was because Rayner "didn't go down the right road and [was] off route[,]" and despite looking for a place to pull over, he was unable to find one due to the construction in the area. Although police officers who investigated the crash testified Rayner was incorrect about the lack of a shoulder on the road due to the construction, Rayner's testimony indicated he was aware he was required to pull over or turn around once he realized he was off route, and that testimony is uncontroverted. Appellees' counsel sought out Croom's agreement during her cross-examination at trial: "Driving the wrong route was a violation of a known safety rule by a professional driver *who knew better*." (Emphasis added). Rayner's failure to pull over or turn around does not indicate he was ignorant of the rules requiring him to do so; the uncontroverted evidence offered by the Appellees confirms he "knew better" than to continue on an unauthorized route. Additionally, EBL was not aware

35

Rayner was off route until after the accident occurred. There was no additional instruction EBL could have provided to Rayner, reminding him of the need to pull over or turn around after he strayed off course—which he consistently testified he was trying to do—because EBL was never afforded an opportunity to do so.

For these reasons, as they pertain to Rayner's purported incompetence to safely operate the vehicle and EBL's knowledge of the alleged incompetence, we find there is no more than a mere scintilla of evidence EBL breached its duties of care under negligent entrustment or negligent hiring, training, and supervision theories. Accordingly, there was legally insufficient evidence any such breach was a proximate cause of the occurrence in question.[6]

### Negligent Maintenance of the Vehicle

Motor carriers, such as EBL, are required to maintain their vehicles "in safe and proper operating conditions[,]" and drivers must be "satisfied that the motor vehicle is in safe operating condition." *Omega Contracting, Inc. v. Torres*, 191 S.W.3d 828, 843 (Tex.App.—Fort Worth 2006, no pet.)(citing 49 C.F.R. §§ 396.3, 396.13 (2018)). While these regulations do not confer a "specific standard of conduct" upon carriers and drivers for purposes of a negligence per se claim, they do confer a reasonable person, ordinary standard of care upon carriers and drivers to maintain the vehicles they own and drive in a safe operating condition. *See id.* at 843. When this ordinary standard of care is breached, the causation analysis is identical to a plain negligence proximate cause inquiry. *See Serv-Air, Inc. v. Profitt*, 18 S.W.3d 652, 657 (Tex.App.—San Antonio 1999, pet. dism'd by agr.)(applying proximate cause analysis in negligent maintenance of an aircraft

---

[6] Appellants contend EBL waived any claims of negligent entrustment by failing to request or obtain jury findings. They argue that submission of EBL's negligence under a general negligence theory does not submit a negligent entrustment theory to the jury. *See Bedford v. Moore*, 166 S.W.3d 454, 464–65 (Tex.App.—Fort Worth 2005, no pet.); *see also Lingafelter v. Shupe*, No. 10-03-00113-CV, 2004 WL 2610515, at *2–3 (Tex.App.—Waco Nov. 17, 2004), *rev'd on other grounds*, 192 S.W.3d 577 (Tex. 2006). However, because we find the evidence adduced at trial was insufficient to support a causation finding on negligent entrustment, even if submitted to the jury, we do not reach this sub-issue of Appellant's argument.

case). In the same vein, motor carriers hold a duty of care to properly hire, train, and supervise their employees to ensure proper maintenance of their vehicles is occurring. *Omega Contracting, Inc.*, 191 S.W.3d at 839 ("The law provides that every motor carrier shall systematically inspect, repair and maintain *or cause to be systematically inspected, repaired and maintained,* all motor vehicles subject to its control." (Emphasis added)).

Appellees point to the following evidence which they argue supports the jury's proximate cause findings against EBL for negligent maintenance:

- Croom testified she "knew prior to the crash . . . that operating a trucking company unsafely would unreasonably put the motoring public at significant risk of death or serious bodily injury[.]"

- Croom testified EBL was required to follow the provisions of the FMCSA regulations, the purpose of which is to ensure "safety on the roads and highways for every one of us[.]"]

- Scott, as EBL's employee in charge of maintaining its fleet of trucks, failed to inspect Rayner's truck personally and did not ensure that Rayner performed and documented a pre-trip inspection before leaving for this trip.

- Rayner was driving a truck with faulty brakes and other out-of-service violations at the time the accident occurred. If the violations were discovered prior to Rayner leaving the yard, the truck would not have been on the road until the issues were repaired.

- Officer Flippin testified if a vehicle fails a pre-trip inspection, it should be repaired before it goes on the roadway.

- The seven out-of-service violations on the truck Rayner was driving "are considered violations that are so serious or hazardous enough that a vehicle cannot be allowed or should not be allowed to continue down the highway."

- On one tire, the rubber was so thin that the belt material was exposed, and two other tires had less than 2/32-inch of tread remaining.

- Officer Flippin's inspection revealed two brakes were out of adjustment and one brake was defective.

- The brake discovered by Officer Flippin to be defective would not have been working at the time of the accident.

- The brakes overall would not have worked as effectively as if all brakes were fully operational.

- "[A]ll required brakes on the vehicle must be operating[]" for a tractor-trailer to operate safely, and "it's not okay just to have a couple of [the brakes] working and a couple of them defective and not working[.]"

- Croom testified the truck "should not have been on the road . . . until it had the tire fixed and the brake."

- Rayner testified that despite only driving twenty miles per hour at the time of the accident, after he engaged the brakes, the truck did not stop until it hit the bridge and continued moving forward until it passed under the second bridge of the overpass.

- Officer Flippin testified a company with fifty-six violations within a ten-month period was a "company [that] is probably not taking care of maintenance the way they should on vehicles[,]" the result of which can be crashes.

The evidence clearly demonstrates a breach of EBL's duty of care to maintain the vehicle Rayner drove at the time of the accident. If nothing else, the expired inspection sticker on the vehicle and the multiple out-of-service violations present at the time of the crash indicate the vehicle was not maintained in a safe operating condition. Additionally, given the inconsistency in which EBL kept its records on pre-trip inspections and other maintenance, combined with the approximately twenty violations on the EBL vehicle following the crash, it is reasonable for the jury to infer EBL did not properly exercise its duty of care to the public to refrain from putting unsafe or hazardous vehicles on the road.

Furthermore, it is foreseeable a company that allows vehicles containing out-of-service violations to continue to operate would be a hazard to other drivers on the road and could cause accidents and even loss of life. This is particularly true when the violations involve items as fundamental as braking systems and tire integrity on eighteen-wheeler trucks. However, the problem in this case arises when we consider whether EBL's breach of its duty to maintain its vehicles, although a foreseeable risk of harm, was a cause-in-fact of Rayner's collision with the bridge.

We consider a recent case out of this Court addressing the sufficiency of evidence proving causation in a negligent maintenance claim where the plaintiffs-appellees sought gross negligence findings against the defendants-appellants. *See Press Energy Services, LLC v. Ruiz*, No. 08-19-00179-CV, 2021 WL 3013313, at \*12 (Tex.App.—El Paso Jul. 16, 2021, no pet.). There, in another trucking accident case, we reviewed the sufficiency of the evidence to support the jury's findings of gross negligence against the trucking company for its lead mechanic's conduct. *See id.* at \*14. The accident occurred when the defendant driver, driving northbound in an eighteen-wheeler tractor-trailer, collided with another eighteen-wheeler tractor-trailer traveling southbound. *Id.* at \*1. The collision occurred in the southbound lane of traffic. *Id.* At trial, the two drivers offered conflicting evidence about who crossed over the center line first. *See id.* However, an eyewitness testified he saw the brakes on the defendant driver's truck lock up, which caused his vehicle to cross the road into oncoming traffic. *Id.* The trailer on the defendant driver's truck jackknifed and hit the cab of the plaintiff's truck, causing it to come off the frame. *Id.*

Expert testimony heard by the jury at trial included the truck had several defects which "predated the collision and were intentional. Not only were the ABS lines cut and zip tied to the truck, the internal and external warning lights were disabled as well. . . . Additionally, the external warning lights for the ABS were removed, filled in, and painted over." *Id.* at \*14. The evidence also showed the lead mechanic "was the last person to conduct an in-depth maintenance check on [the driver's] truck[,]" and it occurred mere months before the accident. *Id.* The lead mechanic "testified he understood that dangers increased with violations of federal safety guidelines, and thus, trucks in violation of those standards cannot, and should not, leave [the company's] shop." *Id.* His deposition testimony, which was read for the jury, "stated he personally disliked ABS braking systems believing they created more problems than they were worth." *Id.* According to

39

this evidence, this Court found it reasonable for the jury to conclude the lead mechanic either created the defects himself or, at the very least, failed to correct them in his role as a managerial employee for the company. *Id.*

There are similarities between the facts in *Press Energy* and the facts of this case. In both cases, the lead mechanic (in EBL's situation, its only mechanic) performed the most recent thorough inspection on the vehicle. In both cases, the vehicle at issue had defects, including brake defects, which were violations of federal safety standards. In both cases, the company mechanics were aware of the danger of operating vehicles with issues that violated federal regulations and acknowledged vehicles with such issues should not be driven. In each of these cases, the foreseeability element is plainly satisfied.

However, crucial distinctions between these cases exist regarding the cause-in-fact element. In *Press Energy*, the jury heard eyewitness testimony that the defendant driver's brakes locked up which caused the truck to cross into the oncoming lane. *Press Energy*, 2021 WL 3013313, at *1. Additionally, expert testimony revealed an ABS fault as well as a fault with the ABS warning light in the truck's cab, both of which he determined predated the collision and would have been present when the truck left the yard since the ABS line was cut and zip-tied and warning lights for the ABS line were disabled, filled in, and painted over. *Id.* at *13 Accordingly, the quality of the braking system on the defendant driver's vehicle was directly at issue in causing the accident and direct evidence through expert testimony confirmed the issues with the brakes were a condition of the vehicle before the accident occurred and had to have been present when the truck left its yard. *Id.* at *14. Based on this evidence, it is reasonable the jury could logically infer the brake issues observed by the eyewitness which caused the trailer to drift into oncoming traffic were the result of braking defects present on the truck prior to and at the time of the accident,

present at the time the vehicle left the yard, and caused or contributed to the accident. *See id.* at *13–14.

In this case, as in *Press Energy*, there is some evidence the brakes may not have been operating at full capacity at the time of the accident. Rayner testified he completed a pre-trip inspection of the vehicle and did not note any issues with the truck, including the brakes. However, other than Rayner's testimony that he completed an inspection, no physical evidence in the form of a DVIR checklist was offered at trial. It is therefore reasonable a jury could disregard Rayner's testimony and infer he did not perform a pre-trip inspection because the completed inspection form was not produced by the Appellants in response to Appellees' discovery requests. *See City of Keller*, 168 S.W.3d at 819 ("Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony."). It is also reasonable that a jury could infer the brake violations were present when the truck left the yard since the officers testified the defective brake was probably not working at the time of the accident based on its condition post-accident. It would also be reasonable for a jury to infer the brake system was not operating at its full capacity at the time of the accident for the same reasons. Additionally, Officer Flippen testified the defective brake would have caused the overall braking system to operate suboptimally when compared to a system where all brakes were fully functioning.

However, none of these inferences standing alone could allow the jury to reach the conclusion the subpar performance of the braking system caused or contributed to the occurrence. Even if the jury reached the reasonable inference the braking system was not operating at full capacity when the accident occurred, they would have to assume Rayner applied the brakes far enough in advance of the bridge, and had they been working at full capacity, the truck would have stopped before reaching the bridge. There is no evidence which gives any indication Rayner timely

41

applied the brakes. Instead, the evidence shows Rayner either did not apply the brakes at all before hitting the bridge or at the very least failed to apply the brakes until hitting the bridge was a foregone conclusion. Claxton testified the truck never slowed down before it hit the bridge. Claxton did not recall seeing any brake lights before the truck hit the bridge.[7] Although Rayner testified he stepped on the brakes and they engaged before he actually hit the bridge, he was clear by the time he stepped on the brakes it was already "too late" to avoid the bridge. Even if these two accounts presented an instance of conflicting evidence, the jury would have to disregard *both* Claxton and Rayner's account of the incident to conclude Rayner braked far enough in advance of the bridge he would have avoided hitting it if the brakes were fully functioning. To make this leap, the jury would have to make assumptions about the timeline of the accident that were not developed at trial and which the evidence directly contradicts. This would be unreasonable and cannot serve as legally sufficient evidence. *See City of Keller*, 168 S.W.3d at 813–14 ("In claims . . . supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exits. . . . [D]rawing an inference based on meager evidence [is] unreasonable[.]"); *see also Suarez v. City of Texas City*, 465 S.W.3d 623, 634 (Tex. 2015)("An inference is not reasonable, however, if it is premised on mere suspicion—'some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence.'")(quoting *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727–28 (Tex. 2003)).

Additionally, Appellees offered no expert testimony regarding braking or other defects on the vehicle being a cause-in-fact of the accident. They also do not address this issue in their brief,

---

[7] One of the violations noted on the EBL vehicle following the incident was obscured or inoperable brake lights. Croom also testified the investigating officers found improper brake lights on the truck. The violation was noted to be on the tractor, unit 1, and not the trailer, which was unit 2. Thus, we have no information the brake lights on the trailer would not have been operational, as no such violation was noted in the post-accident vehicle inspection.

despite Appellants raising it. Expert testimony is needed to prove causation when it requires understanding technical knowledge not commonly known by the public. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006); *see also Press Energy*, 2021 WL 3013313, at *7 (requiring an expert to provide the foundation for the causal nexus connecting the deficient brakes at the time of the accident to the reason the brakes locked up and caused the trailer to enter the oncoming lane of traffic). The physics involved in determining the distance at which it would take a truck at that weight to stop, combined with the mechanical knowledge about the brakes' functionality and the effects of the braking violations noted by the officers, are not matters within "a layperson's general experience and common understanding" where lay testimony can provide adequate proof of causation. *See U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 218 (Tex.App.—San Antonio 2012, pet. denied); *Dumas v. Horn*, 529 S.W.2d 88, 90 (Tex.App.—Texarkana 1975, writ ref'd n.r.e.). The absence of expert testimony indicating the brake issues on the vehicle contributed to the accident constitutes legally insufficient evidence of cause-in-fact. *See Mack Trucks*, 206 S.W.3d at 583; *see also City of Keller*, 168 S.W.3d at 812 ("When expert testimony is required, lay evidence supporting liability is legally insufficient.").

Even if we assume the truck's braking capacity is an issue for which lay testimony could provide evidence of causation, the evidence at trial was legally insufficient to support such a conclusion.[8] If Appellees intended the braking violations to be a cause of the incident, evidence that a timely, proper application of the brakes would have avoided the collision would be required. *See Dumas*, 529 S.W.2d at 90 (finding no proximate cause where no expert or lay testimony was offered about the distance within which vehicle could be stopped by braking, nor physical evidence

---

[8] While "lay testimony establishing a sequence of events which provides a strong, logically traceable connection" between the defect and an event is sufficient proof of causation, *Morgan v. Compugraphic Corp.*, 675 S.W.2d 729, 733 (Tex. 1984), it still must be a matter within "a layperson's general experience and common understanding[.]"*Lynd*, 399 S.W.3d at 218 (citing *Mack Trucks*, 206 S.W.3d at 583).

showing a proper brake application would have avoided the collision). Although Officer Flippin determined the truck had multiple violations involving the brakes, he did not do an investigation of skid marks, braking time, or distance traveled, which would be crucial to support an inference the condition of the brakes played a role in the accident. Rayner testified it would have taken him approximately six truck-lengths to bring the truck to a stop if he was traveling twenty miles per hour.[9] However, there was no evidence presented indicating what distance ahead of the bridge, if at all, he was when he applied the brakes. There was also no evidence presented regarding what distance he traveled after he applied the brakes. Thus, the jury did not have the ability to rely on this part of his testimony as a basis for causation because a vital fact in that equation—his location when he started braking—was wholly absent. *Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 n.3 (Tex. 1993)("When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.")(quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

The evidence put forward by Appellees regarding cause-in-fact of the occurrence was Rayner taking the wrong exit and not pulling over or turning around before the accident occurred. Rayner's testimony elicited in Appellees' cross-examination was he believed he caused the crash "[b]ecause [he] didn't go down the right road and [was] off route." Appellees elicited testimony on more than one occasion that Rayner's deviation from the route was the sole cause of the

---

[9] Rayner testified it would take approximately six truck-lengths to stop his truck if it was traveling twenty miles per hour; however, he also estimated an individual truck length to be three hundred feet. In closing arguments, Appellees' counsel argued Rayner testified it would take approximately 1,800 feet—approximately two-thirds of a mile—to bring his truck to a stop, an argument Appellees reiterate in this appeal. In reality, it appears an individual tractor-trailer has an average length somewhere between seventy and eighty feet. *What Is the Average Length of a Tractor Trailer?*, REFERENCE (Mar. 27, 2020), https://www.reference.com/world-view/average-length-tractor-trailer-e0bd17ae48ab36a. Thus, the stopping distance of six truck-lengths testified to by Rayner would be somewhere in the vicinity of 450 feet. This discrepancy alone indicates Rayner's testimony about stopping distance is unreliable as a basis for determining whether the brakes performed properly at the time the accident occurred.

accident. Appellees went to such lengths developing this sole-cause theory of cause-in-fact that Appellees counsel had Croom sign an exhibit indicating her agreement with the statement, "Mr. Rayner going on the wrong route was the only thing that caused or contributed to this crash." Although evidence presented at trial could have allowed the jury to infer the brakes were not operating at their full capacity at the time of the incident, the brakes as a concurrent cause-in-fact of the accident was not established by the evidence and could not be reasonably inferred from the evidence presented at trial. *See Alarcon v. Alcolac Inc.*, 488 S.W.3d 813, 820–21 (Tex.App.—Houston [14th Dist.] 2016, pet. denied).

Instead, the evidence shows Rayner did not apply the brakes before hitting the bridge was unavoidable; Rayner testified by the time he applied the brakes, it was "too late," and Claxton testified he did not have any indication prior to the collision the truck was slowing down, despite traveling immediately behind the truck.[10] Thus, even if the brakes were faulty to such a degree they would not have stopped the truck if timely applied—evidence which was not established at trial—the uncontroverted evidence proves the brakes were not timely applied. This undisputed fact allows for only one logical inference: the condition of the brakes did not play any role in the truck hitting the bridge because Rayner did not see the bridge or apply the brakes until it was too late for him to avoid hitting it. *See City of Keller*, 168 S.W.3d at 814 ("[A]n appellate court conducting a legal sufficiency review cannot 'disregard undisputed evidence that allows of only one logical

---

[10] To the extent the jury inferred the brakes were in such a condition that when applied at the time of the collision, they were completely inoperable and wholly failed, such an inference is unreasonable and contrary to uncontroverted testimony of the investigating officers, which the jury would have no basis to disregard. First, the jury would have to make an inference based on another inference regarding the brakes' condition prior to the accident, which is improper. *See Alarcon*, 488 S.W.3d at 820–21. Second, testimony by the investigating officers indicated the brakes in their post-accident state might not work to the same degree they would if the violations were not present; however, eleven of the twelve brakes would still have been functional, consistent with Rayner's testimony when he applied the brakes, they engaged.

45

inference. . . . Jurors are not free to reach a verdict contrary to such evidence[.]")(quoting *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 519–20 (Tex. 2002)(plurality op.)).

Did EBL owe a duty to the motoring public to maintain its vehicles in a safe operating condition? Yes. Did EBL breach that duty by having a vehicle with out-of-service violations on the road? Yes. Was it foreseeable the condition of the truck could cause harm to persons on the roadway? Yes. Was the condition of the truck a cause-in-fact of the occurrence? There is legally insufficient evidence to prove it was. Accordingly, we find there is legally insufficient evidence to support a finding of proximate cause against EBL under a theory of negligent maintenance of the truck.

**Gross Negligence of EBL**

We must also consider the sufficiency of the evidence supporting a gross negligence finding against EBL. "A corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence." *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 921 (Tex. 1998). Because corporations only act through their agents, the Texas Supreme Court "developed tests for distinguishing between acts that are solely attributable to agents or employees and acts that are directly attributable to the corporation." *Id.* (citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391–92 (Tex. 1997)). "A corporation is liable for punitive damages if it authorizes or ratifies an agent's gross negligence or if it is grossly negligent in hiring an unfit agent." *Id.* Corporations can also be liable when their vice principal's actions constitute gross negligence. *Id.* at 922 (citing *Hammerly Oaks*, 958 S.W.2d at 389). "Vice principal" includes corporate officers and those with hiring and firing authority for the company. *Id.* Gross negligence is decided by examining "all the surrounding facts and circumstances." *Id.*

46

Because there is insufficient evidence to link EBL's independent actions to causing the incident, we likewise find the evidence is insufficient to support finding the same allegations constitute grossly negligent conduct, including the allegations of negligent hiring. *See Nowzaradan v. Ryans*, 347 S.W.3d 734, 739 (Tex.App.—Houston [14th Dist.] 2011, no pet.)("[I]t is well established that a finding of ordinary negligence is prerequisite to a finding of gross negligence."); *Munoz v. Mo. Pac. R.R. Co.*, 823 S.W.2d 766, 769–70 (Tex.App.—Corpus Christi-Edinburg 1992, no writ)(holding that where there is no basis to impose actual damages, there is no basis to impose exemplary damages); *see also* Sup. Ct. Tex., *Amend. to* Tex. Rules Civ. Proc. 281 & 284 *& to Jury Instructions under* Tex. Rule Civ. Proc. *226A*, Misc. Docket No. 11–9047 (Mar. 15, 2011)("If exemplary damages are sought against a defendant, the jury must unanimously find, with respect to that defendant, (i) liability on at least one claim for actual damages that will support an award of exemplary damages, (ii) any additional conduct, such as malice or gross negligence, required for an award of exemplary damages, and (iii) the amount of exemplary damages to be awarded.")(text also included as historical note to TEX.R.CIV.P. 226a). However, we must also consider whether EBL authorized or ratified the grossly negligent behavior of another, or whether a vice principal committed grossly negligent acts which can be imputed to EBL. *See Mobil Oil*, 968 S.W.2d at 921–22.

Appellants assert Appellees waived a claim of exemplary damages against EBL by failing to request or obtain jury findings on authorization, ratification, or vice-principal theories to impose exemplary damages. They cite Rule 279 of the Rules of Civil Procedure, which states in pertinent part, "Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived." TEX.R.CIV.P. 279. Appellees cite the same rule for their position: any omission of elements

necessary for a negligence finding against EBL under any theory pursued at trial is harmless because "the omitted elements shall be deemed found by the court in support of its judgment if there is factually sufficient evidence to support such a finding." *Rice Food Markets, Inc. v. Ramirez*, 59 S.W.3d 726, 734 (Tex.App.—Amarillo 2001, no pet.); TEX.R.CIV.P. 279. Appellees also state they are not "seeking exemplary damages against EBL based on the acts of Rayner" under the ratification or vice-principal theories imputing gross negligence to an entity, so we will not undertake an analysis of whether Rayner's actions constitute gross negligence or whether liability can be imposed upon EBL through him.

Appellees claim the evidence regarding negligent training of EBL's drivers and its failure to "employ an actual safety manager" is evidence of its gross negligence independent of the acts undertaken by Rayner. They argue the actions of Croom, as owner and manager of EBL, and Scott, who "was employed in a managerial capacity" for EBL, were grossly negligent and thus subjected EBL to gross negligence. But we have already determined, even assuming these actions constitute a breach of a legal duty owed by EBL, there is legally and factually insufficient evidence proving their conduct is a cause-in-fact of the accident. While their actions might otherwise satisfy the test for gross negligence, the lack of a causal link between those actions and the accident precludes a finding of gross liability. *See Nowzaradan*, 347 S.W.3d at 739. Thus, we are not left with any evidence providing a basis for liability of either simple negligence or gross negligence against EBL absent its vicarious liability for the negligence of Rayner, which alone cannot serve as a basis for recovery on gross liability and which Appellees concede does not form the basis for their gross negligence claims. *See Mobil Oil*, 968 S.W.2d at 921–22.

Because the evidence is legally insufficient to support the jury's findings EBL's alleged negligence, separate and apart from its vicarious liability for Rayner's alleged negligence, was a proximate cause of the occurrence, we sustain Appellants' second issue.

### *Issue No. 3: Gross Negligence of Rayner*

In their third issue, Appellants claim the evidence was legally and factually insufficient to meet the clear and convincing evidence standard of proof necessary for a finding of gross negligence against Appellants. Having already determined the evidence is legally and factually insufficient to support a finding of gross negligence against Croom and EBL, we need only consider the propriety of the jury's gross negligence finding against Rayner.

At trial, the jury was instructed to decide whether clear and convincing evidence showed "the harm to RONNIE CLAXTON resulted from gross negligence attributable to DENNIS EDWARD RAYNER[.]" Gross negligence was defined as an act or omission

> which[,] when viewed objectively from the standpoint of [Rayner] at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and of which [Rayner] has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others. [Internal numbering omitted.]

Additionally, the charge instructed the jury, "'Clear and convincing evidence' means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established."

In considering the legal and factual sufficiency of the evidence to support a finding with a heightened burden of proof, such as gross negligence, a reviewing court is held to a higher standard of review as compared to the standard of review applicable to an issue with a preponderance of the evidence burden. *See City of Keller*, 168 S.W.3d at 817. Thus, we must consider all of the evidence and not just the evidence favoring the verdict to review the legal sufficiency of an award

49

of punitive damages. *Id.* Additionally, reviewing "what a party knew or why it took a certain course" requires considering "'all of the surrounding facts, circumstances, and conditions, not just individual elements or facts.'" *Id.* at 817–818 ("Reviewing courts assessing evidence of conscious indifference cannot disregard part of what a party was conscious of. . . . [A] reviewing court cannot review whether jurors could reasonably disregard a losing party's explanations or excuses without considering what they were.").

Gross negligence, as opposed to ordinary negligence, involves both a heightened degree of negligent action in combination with a different mental state of the defendant sufficient to justify a punitive award. *See Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 325 (Tex. 1993). The objective element, also known as the "entire want of care" test, distinguishes ordinary negligence from gross negligence because the act involves a higher "degree or quantity" of negligence. *Id.* Even where an act or omission is "clearly negligent," the objective component of gross negligence requiring "an 'extreme degree of risk' is 'a threshold significantly higher than the objective "reasonable person" test for negligence.'" *Medina v. Zuniga*, 593 S.W.3d 238, 249 (Tex. 2019)(quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994)).

The subjective element, referred to as "conscious indifference," references the defendant's mental state, and requires a showing the defendant "proceeded with knowledge that harm was a 'highly probable' consequence[,]" and nevertheless undertook the negligent action. *Alexander*, 868 S.W.2d at 325. It is not required the defendant intended harm; rather, "[t]he plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare, and safety. In other words, . . . the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care." *Id.* at 326.

50

Appellants correctly point out "gross negligence can never be the result of 'momentary thoughtlessness, inadvertence, or error of judgment.'" *Id.* at 325-26 (citing *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 920 (Tex. 1981)). However, that is because of the subjective portion of the gross negligence question regarding conscious indifference, rather than the objective component as Appellants claim. *See id.* We also note, as the Supreme Court did in *Alexander* and *Burk Royalty*, that the subjective "mental component may be proved indirectly through a defendant's conduct." *Id.* (citing *Burk Royalty Co.*, 616 S.W.2d at 922).

Assuming without deciding the objective element of the gross negligence inquiry is satisfied, we limit our analysis to whether the subjective test is met. Appellants argue the evidence is legally insufficient to prove Rayner continued in a negligent course of conduct—driving off route—that he knew posed an extreme risk of harm to others. Rather, they claim the evidence shows Rayner drove off route for several miles without actually knowing he was off route, and thus was not aware the "harm was a 'highly probable' consequence" of his actions for some time. *See Alexander*, 868 S.W.2d at 325. In other words, he was unaware of the peril his actions created because he did not know he was off the permitted route. *See id.*

Appellees cite to a number of examples where activity that might otherwise be simple negligence, such as driving while fatigued, rises to a level of gross negligence when operating a tractor-trailer. But those examples involve the objective portion of gross negligence involving the elevated risk of the behavior itself. It does not pertain to Rayner's state of mind, which is the relevant inquiry in analyzing the subjective element. Appellees also contend the testimony regarding the truck's unfit condition to be driven should be considered in deciding whether gross negligence has occurred, as well as Rayner's alleged failure to perform a pre-trip inspection on his vehicle. However, we have already determined the condition of the truck played no part in the

incident. Accordingly, no act or omission with respect to the truck's condition can be the act or omission which serves as a basis for a finding of gross negligence. *See Nowzaradan*, 347 S.W.3d at 739 (recognizing that failure to establish ordinary negligence results in failure to establish gross negligence).

As it pertains to Rayner's subjective state of mind preceding the accident, Appellees contend failing to pay attention to what route he was on, failing to immediately pull over or turn around when he did discover his mistake, and failing to call the authorities for assistance constituted gross negligence by Rayner because he knew the extreme risk involved in driving an oversized load off route. Appellees contend Officer Case testified this crash would not have occurred if Rayner had not been distracted. However, this was not the officer's testimony. He testified between Highway 290, where Rayner exited for U.S. 183 going the wrong direction, and Highway 71, where Rayner hit the bridge, there were multiple places where Rayner could have turned around or pulled over. He testified a driver who was not distracted would have seen these exits.

Although Appellees try to frame Rayner's failure to realize he was on the wrong route or see the bridge in time as being the result of distracted driving, there is not sufficient evidence in the record to support this theory. First, it was not established at what point along the route Rayner realized he was off route. The only testimony regarding Rayner's state of mind during his drive came from him. Rayner testified he believed he drove four to five miles of a five to six mile stretch of road before realizing he was not on the designated route. The objective fact the total distance was just over thirteen miles does not change Rayner's subjective belief it was shorter. More importantly, his testimony indicates he drove the majority of the wrong stretch of highway under the mistaken belief it was the correct route. Appellees sought to prove Rayner drove an additional

eight or nine miles the wrong direction after realizing he was off route based on his testimony he believed he traveled five or six miles before realizing his error. But doing so ignores the context of Rayner's testimony that he realized he was going the wrong way four or five miles down a five or six mile stretch of road. Additionally, without any indication at which point on the wrong route Rayner discovered his mistake, Rayner's testimony he observed no place to turn around or exit before he hit the bridge, despite actively looking, becomes entirely plausible.

In considering all the evidence, there is legally insufficient evidence to prove Rayner knowingly continued upon a dangerous course of conduct despite knowing the extreme risk of doing so. It is axiomatic the jury is the sole judge of credibility of the witnesses and can disregard or refuse to give weight to the testimony of witnesses *when it is reasonable to do so. See City of Keller*, 168 S.W.3d at 820. However, to disregard Rayner's testimony regarding his subjective belief in the time leading up to the accident would be, under the circumstances, unreasonable. Appellees' counsel sought an inference from the jury Rayner knowingly continued down the wrong path for eight or nine miles because of his testimony he discovered he was on the wrong route after four or five miles. However, to draw this inference, it would require the jury to take as true Rayner's subjective belief he discovered his error after four or five miles and disregard his subjective belief the entire distance traveled in the wrong direction was scarcely any further than when he discovered his error. The context of Rayner's testimony regarding the distance he traveled before and after realizing he was off route cannot be disregarded by the jury. *See id.* at 812 ("[I]f evidence may be legally sufficient in one context but insufficient in another, the context cannot be disregarded even if that means rendering judgment contrary to the jury's verdict.").

Additionally, the lack of evidence supporting the verdict warrants consideration. Rayner testified he knew when carrying an oversized load, if he discovered he deviated from the permitted

route, he had to pull over or turn around. He further testified as soon as he discovered he was off route he immediately began searching for a safe place to pull over or turn around but was unable to because of construction. Even if a jury chose to disregard that testimony as not credible, there is not legally sufficient evidence supporting the contrary inference he discovered his mistake and yet continued traveling in the wrong direction for several miles without looking for a place to stop. No logical inference can be made from the evidence adduced at trial Rayner had anything to gain from traveling in the wrong direction, off route, for several miles. More importantly, no more than a scintilla of evidence was put on at trial indicating that actually occurred, and certainly insufficient evidence to support the clear and convincing standard of proof borne by the Appellees as the plaintiffs. *See City of Keller*, 168 S.W.3d at 817 ("[A] higher burden of proof requires a higher standard of review.").

We find the evidence legally insufficient to support the jury's finding of gross negligence against Rayner. Appellants' third issue is sustained.

### *New Trial is Proper*

Where a trial court erroneously denies a motion for JNOV, the proper remedy on appeal under the circumstances present here is to reverse the judgment of the trial court and render judgment in favor of the affected parties. *See Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 710 (Tex. 2003)(rendering judgment in favor of the movant when motion for JNOV was proper because no evidence supported an essential element of the claim). Appellants sought the relief from the trial court they now seek on appeal—setting aside the judgment reflecting the jury's findings and rendering judgment in Croom and EBL's favor. Thus, it is proper to grant that same relief to Appellants as the prevailing party on appeal. *See Quaker Petroleum Chemicals Co. v. Waldrop*, 75 S.W.3d 549, 555 (Tex.App.—San Antonio 2002, no pet.)(setting aside the trial

court's judgment reflecting jury's findings and rendering a take-nothing judgment against prevailing parties at trial where trial court improperly denied motion for JNOV).

Accordingly, we find it is proper to set aside the jury's answers and reverse the judgment of the trial court entering judgment against Croom for actual and exemplary damages and against EBL and Rayner for exemplary damages. We further find it is proper to render a take-nothing judgment in favor of Croom against Appellees; render judgment in favor of EBL on Appellees' claims of negligent entrustment, negligent hiring, training and supervising, negligent maintenance, and gross negligence; and render judgment in favor of Rayner on gross negligence.

"A remand in the interest of justice after concluding the evidence is legally insufficient to support a judgment may be appropriate for a variety of reasons." *In the Interest of J.M.T.*, 617 S.W.3d 604, 608 (Tex.App.—San Antonio 2020, no pet.)). One of those reasons is situations "where 'it appears that a party may have proceeded under the wrong legal theory[.]'" *Id.* (quoting *Boyles v. Kerr*, 855 S.W.2d 593, 603 (Tex. 1993)). In cases where only vicarious liability is alleged, such as against an employer for the actions of its employee, the negligence of the employer should not be submitted to the jury for an apportionment of liability because the employee is deemed "one and the same" with his employer. *Bedford v. Moore*, 166 S.W.3d 454, 461 (Tex.App.—Fort Worth 2005, no pet.); *see also Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 656–57 (Tex.App.—Dallas 2002, pet. denied)(explaining it is improper for an employer to be included in the apportionment of responsibility question to a jury if the only responsibility alleged is respondeat superior). Here, because there was legally and factually insufficient evidence to submit EBL's negligence to the jury on any theory of the company's own independent acts of negligence, EBL should not have been listed in the negligence question on the jury charge. *See Bedford*, 166 S.W.3d at 461.

> It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law. Yet, when a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories, the appellate court is often unable to determine the effect of this error. The best the court can do is determine that some evidence *could* have supported the jury's conclusion on a legally valid theory. To hold this error harmless would allow a defendant to be held liable without a judicial determination that a factfinder actually found that the defendant *should* be held liable on proper, legal grounds. . . . Accordingly, we hold that when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory.

*Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000)(internal citations omitted).

Here, the trial court submitted a single, broad-form liability question against the Appellants covering a multitude of theories of liability, several of which were precluded from submission based on legally or factually insufficient evidence. Without knowing upon which theory(ies) the jury based its verdict, particularly against EBL, and observing the jury received no instructions or definitions regarding whether Rayner's or another's actions could be imputed to EBL and under what circumstances, we cannot determine whether the jury's verdict was based on an improper theory. *See id.*; *see also* TEX.R.CIV.P. 277 ("The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict.").

Additionally, because of the legally insufficient evidence to submit Croom's name on the apportionment of liability, in combination with the jury finding Rayner only fifteen percent responsible for causing the accident, we cannot assume (a) responsibility was apportioned based upon proper legal theories, or (b) the jury intended Rayner to be legally responsible for the entirety of the damages awarded. For all of these reasons, we find it is proper to remand this cause to the trial court for a new trial for Appellees' causes of action against Rayner and its respondeat superior claim against EBL.

## CONCLUSION

Having sustained Appellants' first, second, and third issues, we hold as follows:

1.  As to the claims asserted against Michelle Cora Croom in her individual capacity, we set aside the findings of the jury based upon legally and factually insufficient evidence to support them, reverse and render judgment in favor of Croom, and order Appellees take nothing in their causes of action against Croom.

2.  As to the independent theories of negligence asserted against EBL—specifically, negligent entrustment; negligent maintenance; and negligent hiring, training, and supervising— we set aside the findings of the jury based upon legally and factually insufficient evidence to support them, reverse and render judgment in favor of EBL, and order Appellees take nothing in their causes of action to include gross negligence against EBL for negligent entrustment; negligent maintenance; and negligent hiring, training, and supervising.

3.  As to the gross negligence claim asserted against Rayner, we set aside the findings of the jury based upon legally and factually insufficient evidence to support them, reverse and render judgment in favor of Rayner, and order Appellees take nothing in their gross negligence claim against Rayner.

4.  We remand this cause for a new trial for Appellees' remaining causes of action against Rayner and their respondeat superior claim against EBL because the trial court improperly submitted a single, broad-form liability question against the Appellants containing unviable liability theories based on legally or factually insufficient evidence, leaving doubt as to which theories the jury based its verdict, and gave no or inadequate instructions or definitions regarding EBL's vicarious liability.

In holding a new trial is warranted based upon the improper submission of Croom and EBL

in the broad form negligence question submitted to the jury, and inadequate jury instruction, we do not reach Appellants' fourth issue. In reversing and rendering on Appellees' claims of gross negligence against Appellants, we do not reach Appellants' fifth issue.

August 31, 2022

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox and Alley, JJ.
Palafox, J., Concurring and Dissenting